SIGNED THIS: November 20, 2014

_____
**Thomas L. Perkins
United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| CENTRAL ILLINOIS ENERGY | ) | No. 09-81409 |
| COOPERATIVE, | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| A. CLAY COX, not individually but as | ) | |
| Trustee for the estate of Central Illinois | ) | |
| Energy Cooperative, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adv. No. 09-8143 |
| | ) | |
| NOSTAW, INC., an Illinois corporation, | ) | |
| Defendant. | ) | |

**O P I N I O N**

This matter is before the Court on cross motions for summary judgment. The Plaintiff, A. Clay Cox (TRUSTEE), as Trustee for the Chapter 7 estate of the Debtor, Central Illinois Energy Cooperative (DEBTOR), brought this action against the Defendant, Nostaw, Inc. (NOSTAW), to avoid and recover certain payments made by the DEBTOR to NOSTAW as allegedly fraudulent transfers.

**FACTUAL BACKGROUND**

The DEBTOR was an agricultural cooperative formed under Illinois law by a coalition of farmers in the Central Illinois area in October, 2001, for the purpose of constructing and operating an ethanol facility for the processing of its members' corn into ethanol and other by-products. In March, 2004, Central Illinois Holding Company, LLC, and Central Illinois Energy, LLC (CIE), were formed, with the DEBTOR owning a 71% interest in the holding company. CIE, a wholly owned subsidiary of the holding company, was formed to construct and operate the ethanol production plant and waste-coal fired power generating facility on land adjacent to the grain handling facility. CIE retained Lurgi, Inc., as the general contractor to build the ethanol plant.

The DEBTOR retained the responsibility for the construction of the adjacent administration building and the grain handling facility. In March, 2005, the DEBTOR entered into a contract with NOSTAW, as general contractor, for the construction of the administration building and the grain handling facility. The final cost of NOSTAW'S contract was $5.4 million, while the cost of the ethanol plant was far greater, in excess of $100 million. On November 17, 2006, the DEBTOR borrowed $2,000,000, from Whitebox CIE Pledgors, Inc., to partially finance construction of the grain handling facility. The loan, evidenced by a single note, required monthly payments to be made in the amount of $26,563, and called for payment in full, with interest at 15%, on May 17, 2007.

By June, 2007, both construction projects had encountered serious financial difficulties. The DEBTOR was unable to repay the Whitebox note when it matured and was significantly behind in the payment of NOSTAW'S invoices. At that time, NOSTAW

was owed $2,490,537.67, and was considering ceasing work and filing a lien on the project. On June 12, 2007, as a way of addressing its financial difficulties, the DEBTOR sold, subject to a conditional repurchase obligation, substantially all of its assets, including the unfinished grain handling facility and administration building, to Green Lion Bio-Fuels, LLC, for the sum of $7,750,000 (the "Green Lion Purchase Agreement"). As an offset against the purchase price, Green Lion agreed to assume certain liabilities of the DEBTOR, including:

1. $976,295.67 to NOSTAW;
2. $258,777.83 to NOSTAW; and
3. $251,722.29 to Leander Construction

Despite the sale of the assets to and the assumption of liabilities by Green Lion, the DEBTOR agreed to proceed with, and be fully responsible for, the construction of the project through its completion. Construction pay requests were to be paid by Green Lion's lender, Ridgestone Bank, in accordance with the terms of its loan documents. NOSTAW was not a party to the Green Lion Purchase Agreement.

By separate agreement of the same date (the "Green Lion Payment Agreement"), for the stated purpose of "balancing" the construction loan, NOSTAW agreed to accept as full payment of its contract:

1. $1,236,857.33 in cash at the closing of Green Lion's purchase.
2. $258,777.83 in future cash payments as progress on the project proceeded.
3. A promissory note from Green Lion in the amount of $976,295.67, secured by a second mortgage on the property.

The Green Lion Payment Agreement was executed by the DEBTOR, Green Lion and NOSTAW.

3

Also, by separate agreement of the same date (the "Green Lion Recapitalization Agreement"), stated to be part of a recapitalization plan for CIE, Green Lion agreed to transfer title to the assets purchased from the DEBTOR to CIE for the sum of $7,750,000 plus expenses.  If the plan to recapitalize CIE failed to be consummated by November 1, 2007, the DEBTOR was required to repurchase the assets from Green Lion for the same price.  NOSTAW was not a party to the Green Lion Recapitalization Agreement, but it did execute a written consent, expressly acknowledging the rights of CIE and the conditional obligation of the DEBTOR to purchase the grain handling assets from Green Lion and agreeing to honor those rights and obligations in the event of any foreclosure proceedings NOSTAW might pursue against Green Lion.

At the Green Lion closing, NOSTAW was paid the agreed upon amount of $1,236,857.33.  The promissory note dated June 12, 2007, from Green Lion to NOSTAW, carrying a maturity date of October 15, 2007,  provided that Green Lion would use its best efforts to pay it by August 15, 2007.

Green Lion made a payment to NOSTAW on August 24, 2007, in the amount of $255,777.83.  NOSTAW continued to work on the grain handling facility until sometime in September, 2007. Green Lion made no further payments to NOSTAW. In discussions with Mike Smith, the DEBTOR'S general manager, NOSTAW stated that it needed to be paid in order to complete the project.  As a consequence of NOSTAW'S payment demands and Green Lion's apparent inability to pay its note, the DEBTOR agreed to assume the obligation to pay NOSTAW the remaining amounts it was owed.  The DEBTOR and NOSTAW executed a written agreement (the "Second Agreement") dated September 28, 2007, whereby the DEBTOR agreed to pay NOSTAW $988,859.83, with a down payment

4

of $300,000, and the balance to be paid "as agreed upon as work progresses."[1] With board approval, the DEBTOR borrowed $1,000,000 from Whitebox Advisors, to make the required payments. The DEBTOR made three payments of $300,000 each, to NOSTAW, on October 9, 2007, October 26, 2007 and November 23, 2007.

**PROCEDURAL BACKGROUND**

In November, 2007, as a result of disputes arising from construction delays and cost overruns, Lurgi, Inc., ceased work on the ethanol plant and related power facility being built by CIE. CIE filed a Chapter 11 petition on December 13, 2007. Unable to obtain debtor-in-possession financing, CIE negotiated an agreement with Credit Suisse, its lead secured lender, for a section 363 sale of its assets through a credit bid to New CIE Energy Opco, LLC. The sale was approved by the Court on April 24, 2008. CIE's Chapter 11 case was thereafter converted to Chapter 7 on August 4, 2008.

A Chapter 11 involuntary petition was filed against the DEBTOR on May 1, 2009. The DEBTOR did not file an answer and an order for relief was entered on June 18, 2009. The case was converted to Chapter 7 on July 16, 2009, on the motion of the United States Trustee. The TRUSTEE brought this adversary proceeding alleging five alternative theories of recovery, in three counts, to avoid and recover the three payments totaling $900,000 made to NOSTAW on October 9, 2007, October 26, 2007, and November 23, 2007, as either actual or constructively fraudulent transfers.[2] Count I is brought pursuant to section

---

[1] In their briefs, the parties refer to the September 28, 2007 agreement as the "Second Agreement." For the sake of consistency, the Court adopts that nomenclature.

[2] In his complaint, the TRUSTEE also sought to recover a payment made by the DEBTOR to NOSTAW of $50,000 in June, 2007. The TRUSTEE determined that the DEBTOR was contractually liable for that payment, and he is no longer seeking to recover it.

5

548(a), alleging both actual fraud under section 548(a)(1)(A) and constructive fraud under section 548(a)(1)(B). Counts II and III assert claims under the Illinois Uniform Fraudulent Transfer Act (IUFTA), made applicable through section 544(b) of the Bankruptcy Code. Count II alleges actual fraud under 740 ILCS 160/5(a)(1) and constructive fraud under 740 ILCS 160/5(a)(2). Count III alleges constructive fraud under 740 ILCS 160/6(a). Because Illinois' fraudulent transfer law is an adoption of the Uniform Fraudulent Transfer Act and parallels section 548 of the Bankruptcy Code, the statutes have been interpreted similarly by the courts, permitting analysis of the federal and state claims of actual fraud and constructive fraud together. *See Baldi v. Samuel Son & Co., Ltd.*, 548 F.3d 579 (7th Cir. 2008).

**ISSUES**

The TRUSTEE'S motion seeks partial summary judgment only as to the allegations of constructive fraud in Counts I, II and III, the fraudulent transfer counts pled under section 548(a)(1)(B) of the Bankruptcy Code and sections 5(a)(2) and 6(a) of the IUFTA. NOSTAW filed a cross motion for summary judgment on all counts of the complaint. At issue on the claims of constructive fraud is whether the DEBTOR received reasonably equivalent value in exchange for its payments to NOSTAW. The absence of reasonably equivalent value is a necessary element of proof for the TRUSTEE; failure of such proof would warrant judgment for NOSTAW. The TRUSTEE asserts that the DEBTOR, having sold its assets to Green Lion and Green Lion having assumed the obligation to NOSTAW, received no value in exchange for paying the obligation owed by Green Lion. The TRUSTEE maintains that the Green Lion Payment Agreement, executed in connection with the Green Lion Purchase Agreement, was a novation, releasing the DEBTOR from liability

6

under the general contract with NOSTAW. The TRUSTEE also argues that NOSTAW cannot show that the DEBTOR received an indirect benefit from the transfer which is identifiable and fairly concrete.[3] NOSTAW disputes that a novation was intended and contends that even if a novation occurred in June, 2007, the DEBTOR re-obligated itself to pay NOSTAW through the Second Agreement on September 28, 2007, prior to making the challenged payments.

**SUMMARY JUDGMENT STANDARDS**

Under Federal Rule of Civil Procedure 56(c), made applicable to adversary proceedings in bankruptcy by Federal Rule of Bankruptcy Procedure 7056, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In order to prevail on a motion for summary judgment, the moving party must establish there is no genuine issue of material fact as to any essential element of the claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a moving party has met its initial burden of showing there is no genuine issue of material fact, the burden shifts to the nonmovant to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial. Inferences to be drawn from underlying facts must be

---

[3] Where a debtor pays an obligation of a third party, the debtor may receive reasonably equivalent value if the debtor and the third party share an identity of interests or if the debtor receives an indirect benefit with a quantifiable economic value. *In re Image Worldwide, Ltd.*, 139 F.3d 574, 579 (7th Cir. 1998); *Smith v. American Founders Financial, Corp.*, 365 B.R. 647, 666-67 (S.D.Tex. 2007). Because the DEBTOR was contractually obligated to pay NOSTAW when the challenged payments were made, it is not necessary to consider these alternative theories of value.

viewed in the light most favorable to parties opposing the motion. *In re Chambers*, 348 F.3d 650 (7th Cir. 2003). A material factual dispute is sufficient to prevent summary judgment only when the disputed fact is determinative of the outcome under applicable law. *Smith ex rel. Smith v. Severn,* 129 F.3d 419, 427 (7th Cir. 1997).

**ANALYSIS**

Resolution of the constructive fraud claims turns on whether the DEBTOR was obligated to NOSTAW for the three payments of $300,000 each it made in October and November, 2007, so that the payments discharged its liability, thereby providing equivalent value. As a matter of statutory law, "value" includes satisfaction of a present or antecedent debt of the debtor. 11 U.S.C. § 548(d)(2)(A); 740 ILCS 160/4(a). Therefore, a debtor's transfer of funds in satisfaction of its own debt is not constructively fraudulent. *In re Southeast Waffles, LLC,* 702 F.3d 850, 857 (6th Cir. 2012); *B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474, 478 (7th Cir. 2005); *HBE Leasing Corp. v. Frank,* 48 F.3d 623 (2d Cir. 1995); *In re Crucible Materials Corp.,* 2012 WL 5360945 (Bankr.D.Del. 2012); *In re Michigan Machine Tool Control Corp.,* 381 B.R. 657, 668 (Bankr.E.D.Mich. 2008)(the constructive fraud statutes do not prohibit a debtor from paying contractual obligations, even where the continued payment of those obligations contributes to a debtor's insolvency).

It follows that while a debtor's payment may be preferential or it may be constructively fraudulent, it cannot be both. *See B.E.L.T., Inc., supra.* Since the DEBTOR'S payments to NOSTAW were all made well before the applicable preference period, as defined by Bankruptcy Code section 547(b)(4), attempting to avoid the payments as

8

preferences was not an option for the TRUSTEE, so he was limited from the outset of this case to the fraudulent transfer theories. In order to prevail on the constructive fraud theories, the TRUSTEE must prove that at the time of the payments, the DEBTOR was not contractually liable to NOSTAW for the amounts paid.

The parties spend a great deal of effort arguing about the effect of the Green Lion Payment Agreement in June, 2007, which the TRUSTEE contends constituted a novation, substituting Green Lion as the sole party liable for NOSTAW'S construction charges and discharging the DEBTOR from that liability. NOSTAW denies that it intended to release the DEBTOR from liability, contending that in the absence of such intent, the Payment Agreement operated to add Green Lion as an additional party liable for the charges, with the DEBTOR remaining liable.[4]

The Green Lion Payment Agreement does not address whether the DEBTOR'S liability to NOSTAW is to be retained or released, so it is ambiguous on that point. It is not necessary to resolve that ambiguity, however, since even if the DEBTOR was released from liability via the Green Lion Payment Agreement, the DEBTOR subsequently re-obligated itself to pay NOSTAW. The TRUSTEE admits that the DEBTOR agreed to pay NOSTAW and executed the Second Agreement dated September 28, 2007, evidencing the obligation. The Second Agreement provides that the DEBTOR would pay NOSTAW the total amount of $988,859.83. After its Board of Directors approved a $1.0 million loan, the DEBTOR

---

[4]Under Illinois law, to constitute a novation by substitution of debtors, the creditor must have agreed to release the original debtor and to accept the new debtor in his stead. *Burnett v. West Madison State Bank,* 375 Ill. 402, 410, 31 N.E.2d 776 (1941).

made the three payments to NOSTAW of $300,000 each on October 9, 2007, October 26, 2007, and November 23, 2007.[5]

The TRUSTEE asks the Court to disregard the Second Agreement as having been undertaken for no consideration, asserting that it obligated the DEBTOR to pay NOSTAW for work already completed and invoiced as of June 12, 2007, the liability for which had been assumed by Green Lion. The TRUSTEE contends that the Second Agreement was itself avoidable as a fraudulent transfer under sections 5(a)(2)(B) and 6(a) of the IUFTA, arguing that the DEBTOR'S execution of the Second Agreement does not "legitimize" the challenged transfers.

The TRUSTEE correctly acknowledges that the incurrence of a debt by a debtor may be avoidable as fraudulent. Under the applicable statutes, it is not only transfers of money or property that may be avoided as fraudulent; obligations incurred by a debtor may also be avoided as fraudulent if the same elements of avoidance are proved. *See* 740 ILCS 160/5(a), 6(a); 11 U.S.C. § 548. The problem for the TRUSTEE is that he has not filed a complaint seeking to avoid the Second Agreement as fraudulent and the time for doing so has long since expired.[6] NOSTAW does not agree that the Second Agreement was fraudulently entered into. This factual dispute is not material, however, in light of the time

---

[5]According to the DEBTOR'S Board meeting minutes dated October 1, 2007, the loan from Whitebox Advisors was approved "to ensure completion of the work at the grain handling facilities." An accompanying Resolution, dated the same day, authorizing the DEBTOR'S officers to consummate the loan, recites that the loan was necessitated because Green Lion's lender was unwilling to disburse further funds due to uncertainty about CIE's financial resources and that NOSTAW threatened to stop work until paid.

[6]The order for relief on the involuntary petition against the DEBTOR was entered on June 18, 2009. Under section 546(a)(1), the time for commencing avoidance actions expired on June 18, 2011.

bar. Under these circumstances, the TRUSTEE'S belated attacks on the Second Agreement carry no weight and are properly disregarded.

Because the TRUSTEE is barred from seeking to avoid the Second Agreement as a fraudulently incurred obligation, it is not necessary to address whether its avoidance would have had the retroactive effect sought by the TRUSTEE. This Court is not aware of any reported opinion that holds that avoidance of a contractual payment obligation means that the payments made in satisfaction of the obligation were, *ipso facto,* not made for value, even though at the time of the payments the debtor received a dollar for dollar discharge of a valid contractual debt.[7] For purposes of a constructive fraud analysis, value is determined as of the transfer date. *In re Hinsley,* 201 F.3d 638, 644 (5th Cir. 2000); *In re McCook Metals, L.L.C.,* 319 B.R. 570, 589 (Bankr.N.D.Ill. 2005).

Under the Second Agreement, the DEBTOR undertook the obligation to pay NOSTAW $988,859.83. The Second Agreement is not subject to avoidance. The DEBTOR subsequently made three payments of $300,000 each to NOSTAW thereby discharging its debt to the extent of $900,000. The dollar-for-dollar discharge of indebtedness is "value" for purposes of the constructive fraud analysis. NOSTAW is entitled to the entry of judgment on the TRUSTEE'S constructive fraud claims.

With respect to the alternative causes of action for actual fraud, set forth in Counts I and II of the complaint, the TRUSTEE concedes that he has produced no evidence of

---

[7]In this Court's view, the primary purpose for the statutory power to avoid a fraudulently incurred obligation is to prevent an undeserving claimant from sharing in the distribution of limited funds upon liquidation of a debtor's assets and reducing the distribution to legitimate creditors.

actual fraud. On a defendant's motion for summary judgment, a plaintiff's failure to offer evidence on a necessary element of his claim is tantamount to an abandonment of that claim. *De v. City of Chicago,* 912 F.Supp.2d 709, 733-34 (N.D.Ill. 2012)(failure to oppose motion for summary judgment with evidence and legal argument constitutes abandonment of claim, collecting cases). Accordingly, NOSTAW is entitled to summary judgment on the actual fraud claims contained within Counts I and II.[8]

This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

###

---

[8] It was the TRUSTEE'S burden to introduce some evidence that the DEBTOR, by paying NOSTAW, intended to hinder, delay or defraud other creditors. Summary judgment is the "put up or shut up" moment in litigation when the plaintiff is required to marshal and present to the court the evidence that he contends will prove his case. *See, e.g., Goodman v. National Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). The TRUSTEE, however, can hardly be faulted for abandoning the actual fraud claims. In the absence of a Ponzi scheme or an insider transfer, it is hard to see how a debtor's payment to a creditor, even if preferential, could be characterized as an actual fraud against other creditors. *B.E.L.T., Inc.,* 403 F.3d at 478. By obtaining a loan and transferring the earmarked proceeds to NOSTAW, the DEBTOR merely substituted one creditor, Whitebox Advisors, for another, NOSTAW. Moreover, from the evidence in the record, it is clear that the loan and the payments to NOSTAW were intended as a last ditch attempt by the DEBTOR to prevent the collapse of the entire project.